**PUBLIC CITIZEN HEALTH RESEARCH GROUP, Plaintiff,**

v.

**FOOD AND DRUG ADMINISTRATION, et al., Defendants.**

Civ. A. No. 79–1710.

United States District Court, District of Columbia.

May 11, 1982.

Patricia J. Kenney, Asst. U. S. Atty., Philip Derfler, Chief Counsel's Office, David C. Vladeck, Public Citizen Health Research Group, Washington, D. C., for plaintiff.

Leighton, Conklin, Lemov, Jacobs & Buckley, Jerald A. Jacobs and Richard F. Mann, Washington, D. C., for defendants.

## MEMORANDUM OPINION

CHARLES R. RICHEY, District Judge.

This matter is before the Court on cross-motions for summary judgment, oppositions to the motions, replies, and various other supplemental filings.

In this action under the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, plaintiff Public Citizen Health Research Group ("HRG"), a non-profit organization engaged in research and consumer advocacy on health and safety matters, brings suit against the Food & Drug Administration ("FDA"), the Department of Health & Human Services ("HHS"), and various manufacturers of intraocular lenses ("IOLs") who are the sponsors of FDA studies of IOLs.

HHS is an agency of the United States and is charged with administration of the federal Food, Drug & Cosmetic Act ("FDCA"), 21 U.S.C. §§ 301–679. Under its regulations, HHS is responsible for reviewing appeals from denials by the FDA of requests for records under FOIA. Defendant FDA is an agency within HHS and has possession of the records to which plaintiff seeks access.

The corporate defendants, manufacturers of "IOLs", are conducting clinical tests under the authority of the FDA to confirm the safety and effectiveness of IOLs. In order to obtain approval to conduct these clinical tests, the corporate defendants submitted extensive information about IOLs in applications to FDA. They have continued to modify and supplement that information through additional filings and reports.

Plaintiff has requested portions of the clinical test information in a series of six requests under FOIA. FDA has denied portions of these requests, leading to plaintiff's filing of this action. Since the action was filed, plaintiff has narrowed the scope of its requests.

On these cross-motions for summary judgment, the Court has considered all the pleadings, the affidavits and the entire record herein. If either moving party shows that there is no genuine issue as to any material fact and that he is entitled to a judgment as a matter of law, the motion will be granted. Fed.R.Civ.P. 56(c). When the Court reviews the motions, however, "all inferences to be drawn from the underlying facts contained in [the movant's] materials must be viewed in the light most favorable to the party opposing the motion." *United States v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962). "Indeed, the record must show the movant's right to [summary judgment] with such clarity as to leave no room for controversy, and must demonstrate that his opponent would not be entitled to [prevail] under any discernable circumstances." *National Ass'n of Government Employees v. Campbell,* 593 F.2d 1023, 1027 (D.C.Cir.1978) (*quoting United States v. Diebold, Inc.,* 369 U.S. at 655, 82 S.Ct. at 994). Applying these principles to the case at bar, the Court first concludes that the instant circumstances do not present any disputed issues of material fact.

■ The corporate defendants have maintained the clinical test information in confidence, revealing portions of it only to outside consultants or proper governmental employees on a need-to-know basis, that is, to the extent necessary to gain approval from the FDA. This kind of limited disclosure does not destroy the confidentiality of the information. 21 C.F.R. § 20.81(a)(1), (3); 21 C.F.R. § 813.20(b)(6)(i).

IOLs are tiny clear disks that surgeons implant in patients' eyes to correct vision following removal of cataracts. The concept is not new. During World War II, British surgeons discovered that bits of plastic airplane canopy embedded in the eyes of downed airplane pilots had remained inert there. Prompted by these findings, they were moved to devise the first IOLs, and the devices were publicly available more or less continuously from those times until 1978 when FDA decided that investigations were necessary to confirm the safety and effectiveness of IOLs.

Since then, IOLs have been available in the United States only on a limited basis. For the time being, the manufacturers are to conduct a wide range of tests and report extensively on the results to FDA. In conjunction with the manufacturers, a limited number of doctors are allowed to implant IOLs into the eyes of patients as part of the tests. The manufacturers are also required to report extensively on their prior experience (pre-1978) with IOLs.

■ Before examining the individual documents, the Court will review the applicable law. The primary purpose of FOIA, which provides generally for disclosure of agency records and information, is to open the administrative processes to the scrutiny of the press and the general public. *Renegotiation Board v. Bannercraft Clothing Co.*, 415 U.S. 1, 94 S.Ct. 1028, 39 L.Ed.2d 123 (1974). There are, however, certain exemptions to the general rule of disclosure. For instance,

> (b) This section [5 U.S.C. § 552] does not apply to matters that are—
>> (4) trade secrets and commercial or financial information obtained from a person and privileged or confidential;
>> . . .

5 U.S.C. § 552(b)(4).

■ Insofar as it may be necessary to resort to a precise definition of trade secret, the Court will use the *Restatement* definition, since it is by far the most widely accepted. It reads as follows:

> A trade secret may consist of any formula, pattern, device or compilation of information which is used in one's business and which gives him an opportunity to obtain an advantage over competitors or suppliers who do not know or use it.

IV *Restatement of Torts* § 757, comment b (1938). Furthermore, the legislative history of the Medical Device Amendments of 1976, while noting that an exact definition of trade secret is impossible, makes specific reference to this particular definition. The House Report noted that

> The Committee recognizes the need for protection of any trade secret material submitted to the Food and Drug Adminis-

tration under the provisions of the proposed legislation by manufacturers of medical devices if their competitors are not to gain unfairly from the time and financial commitment expended in developing a device. * * * [I]t is widely recognized that an exact definition of a trade secret is impossible, since such subjective considerations ... govern whether information constitutes a trade secret. According to the Restatement of Torts, if there is a key to determining whether information has trade secret status, it is that it has characteristics that give its possessor an opportunity to obtain an advantage over competitors who do not know it.

H.R.Rep.No.94–853, at 48–49, 94th Cong.2d Sess. 48 (1976). In its regulations, the FDA has adopted the Restatement definition verbatim. 21 C.F.R. § 20.61(a). According to the law of this Circuit, once a document in question is determined to be a trade secret, the inquiry ends there and the document is exempt from the requirements of FOIA. *National Parks & Conservation Ass'n v. Morton*, 498 F.2d 765, 766 (D.C.Cir.1974), (*"National Parks I"*).

However, the other important category under FOIA Exemption 4 is "commercial or financial information obtained from a person and privileged or confidential." This category requires a more intricate analysis than the trade secret category. "In order to bring a matter (other than a trade secret) within this exemption, it must be shown that information is (a) commercial or financial, (b) obtained from a person, and (c) privileged or confidential." *National Parks I* at 766.

■ The first question, whether the information sought is of a "commercial" nature, is better answered during specific examination of the individual documents. (The defendants do not maintain that the information is "financial" in nature). With regard to the second consideration, there is no dispute as to the fact that this information has been "obtained from a person," namely, each of the corporate manufacturers.

**1326**

■ For guidance on whether this information is privileged or confidential, the Court turns to *National Parks I*, which states that

commercial ... matter is 'confidential' for purposes of the exemption if disclosure of the information is likely to have either of the following effects: (1) to impair the Government's ability to obtain necessary information in the future; [17] or (2) cause substantial harm to the competitive position of the person from whom the information was obtained.

[17] We express no opinion as to whether other governmental interests are embodied in this exemption. *Cf.* 1963 Hearings at 200 where the problems of compliance and program effectiveness are mentioned as governmental interests possibly served by this exemption.

*Id.* at 770; *National Ass'n of Gov't Employees v. Campbell*, 593 F.2d 1023, 1026 (D.C. Cir.1978).

■ Since the IOL manufacturers are required to submit the information in question in order to gain approval to market their devices, we presume that the government's ability to obtain necessary information in the future is not likely to be impaired by release of the documents sought here. *Worthington Compressors, Inc. v. Costle*, 662 F.2d 45 at 52 (D.C.Cir.1981).

■ The next question, whether disclosure is likely to cause substantial harm to the competitive position of the submitter, has been the subject of extensive judicial interpretation and is often determinative in Exemption 4 cases in this Circuit. This determination should not be an elaborate, antitrust litigation-style examination. *National Parks & Conservation Ass'n v. Kleppe*, 547 F.2d 673, 681 (D.C.Cir.1976) ("*National Parks II*"). Further, "it is not necessary to show actual competitive harm. Actual competition and the likelihood of substantial injury is all that need be shown." *Gulf & Western Industries, Inc. v. United States*, 615 F.2d 527, 530 (D.C.Cir. 1979). Resolution of this issue in favor of the defendants requires them to prove that "(1) they actually face competition, and (2) substantial competitive injury would likely result from disclosure." *National Parks II, supra* at 679.

In the instant case, a competitive market exists. All of the IOL manufacturers are vying to be the first to gain general marketing approval from FDA. While it could conceivably be true that the grant of general marketing approval to one of the manufacturers might speed up the eventual grant of the same approval to other manufacturers, there are significant differences between each sponsor's IOL, and the devices are in no way standardized or uniform. For example, Lynell Medical Technology, Inc. makes their IOLs out of glass rather than plastic as is the general custom. The various manufacturing processes also differ. Intermedics Intraocular, Inc. uses a lathe process; Precision-Cosmet Co., Inc. uses an unusual lathing process combined with compression molding. The problems that each firm encounters are also different. For instance, Medical Workshop U.S.A., Inc., because of difficulty with their sterilization processes, was required by FDA to undertake a sterilization recall, while another firm had problems with "reprocessing." (*See* Affidavits attached to Corporate Defendants' Motion for Summary Judgment.)

■ Another indicator of the competition that exists is the advertising currently being conducted by the IOL sponsors. Although subject to limitations and restrictions, the manufacturers are advertising to the full extent of the law. Once general marketing approval is granted, even more vigorous advertising will be undertaken. The IOL manufacturers not only face competition from each other, but also from the other post-cataract surgery correction devices available to cataract patients, such as contact lenses and cataract lenses. Competition exists abroad as well as in the United States. Manufacturers are now producing IOLs in the United Kingdom, the Netherlands and West Germany. In Japan, at least two companies are developing manufacturing processes. (Corporate Defendants' Economic Report at II–13).

Since there is no genuine issue as to the existence of actual competition, the inquiry shifts to whether substantial competitive injury to the manufacturers would likely result from disclosure. The Court must now look to the specific documents individually, in order to answer this question and the question of whether or not the information sought is "commercial" in nature. In some instances the information sought may not be commercial in the strict sense of the word. In that case, the Court must also inquire whether competitors could indirectly *derive*, for example, by processes analogous to the reverse engineers discussed in *Worthington Compressors*, confidential commercial information or trade secret information from the information contained in the documents. See *Worthington Compressors v. Costle*, 662 F.2d 45 (D.C.Cir. 1981).

(a) *V–3*: undated summary report of complications and adverse reactions in IOL studies, presented to the FDA Opthalmic Panel on January 8–9, 1979; includes complication rate for control group and average complication rates for all sponsors.

*Portions withheld*: (1) Percentages of complications reported by 10 sponsors of approved Investigational Device Exemptions (IDEs) along with high and low complication rates. (2) Charts that give comparisons of data reported by one group of firms with data reported by another based on methods of reporting and (3) that give adverse reactions reported by ten sponsors by lens class.

*Basis advanced for withholding*: The interim results of each sponsor's IDE study are allegedly confidential commercial information.

██ *Analysis*: (1–2): These percentages and charts are not strictly speaking commercial information. Nor could commercial information be derived from general summaries of this sort. Even if this could be considered commercial information, it is in such a generalized format, void of specific information on particular companies, that it is hard to conceive of how substantial competitive injury would result from its release.

Therefore, the Court holds that parts (1) and (2) of document V–3 are not exempt under FOIA Exemption 4.

██ (3): The charts that give adverse reactions reported by ten sponsors by lens class, however, would indicate to the competitors of these ten sponsors which classes of lenses are less likely to result in adverse reactions. From this information, these competitors could concentrate their energies on the "safer" lens classes, which presumably would be more profitable to manufacture. As a result, these ten sponsors would sustain substantial competitive injury because their competitors would be receiving, free of charge, the benefits of this costly research and testing. Therefore, these charts that categorize adverse reactions by lens class are confidential commercial information exempt from disclosure under FOIA Exemption 4.

██ (b) *VI–2*: undated summary report of adverse reactions in IOL studies, presented to Opthalmic Panel, May 14, 1979; includes aggregate average adverse reaction rates for ten sponsors.

*Portions withheld*: number or percentages of adverse reactions reported by ten sponsors along with high and low rates; average results of posterior lenses denied entirely.

*Basis advanced for withholding*: the interim results of each sponsor's IDE study are confidential commercial information; for posterior lens information, competitors could disaggregate.

*Analysis*: the Court's analysis of document V–3 applies to document VI–2 as well. The only difference with VI–2 is the additional claim that competitors could disaggregate the information relating to posterior lenses. On this point, however, the Court holds that defendants have not sustained their burden of proof. They have not shown how the disaggregation could be accomplished, nor have they shown the likelihood of substantial competitive injury as a result thereof. Therefore, document VI–2 is not exempt under FOIA Exemption 4.

**1328**

■ (c) *VI–1*: Adverse Reaction Summary Log, February 9, 1978, through May 21, 1979, maintained of BMD by manufacturer; includes investigator name, patient initials, date, lens style and number, adverse reaction and result of firm's investigation of it (sample disclosed). (Plaintiff consents to deletion of patient and physician identifiers).

*Portion withheld*: whole document.

*Basis advanced for withholding*: a compilation of data on a manufacturer-by manufacturer basis about adverse reactions would reveal results of IDE studies of IOLs by holders of approved IDEs. The results of these studies are trade secret information and confidential commercial information.

*Analysis*: the information in VI–1 involves a great deal of detail on the products of each manufacturer, even going so far as to specify lens styles and numbers, and the results of each firm's investigations of adverse reactions. This information itself is trade secret and confidential commercial information, the disclosure of which is likely to cause defendants substantial competitive injury. It is also likely that this kind of specific information, in the hands of knowledgeable competitors, could be used to uncover other trade secrets and confidential commercial information relating to the submitting manufacturers' product, and this, as well, would likely lead to substantial competitive injury to the submitters. Therefore, the Court holds that document VI–1 is exempt from disclosure under FOIA Exemption 4.

■ (d) *IDE–24*: reports (about 3,000) on adverse reactions during IOL studies submitted by study sponsors to FDA from February, 1978, to April, 1979, as required by regulations; they contain physician and patient names, dates, lens styles and serial numbers, and physicians' diagnoses or prognoses. (Plaintiff consents to deletion of patient and physician identifiers).

*Portion withheld*: whole documents.

*Basis advanced for withholding*: results of IDE studies are confidential commercial information and trade secret information.

*Analysis*: although the information contained in IDE–24 is not the same as that in VI–1, it involves the same degree of detail. Lens styles and serial numbers, with the corresponding physicians' diagnoses or prognoses, constitute confidential commercial information. It would not be difficult for a knowledgeable competitor to glean other commercial information (with resultant substantial competitive injury) from the specific information contained in these documents. Therefore the Court holds that they are exempt under FOIA Exemption 4.

■ (e) *IDE–0 through IDE–23*: reports (apparently pre–1978) on prior experience with IOLs submitted by study sponsors in IDE applications to FDA.

*Portion withheld*: whole documents.

*Basis advanced for withholding*: information regarding IDE studies is confidential commercial information and trade secret information.

*Analysis*: a manufacturer's reports on his prior experience with his product go to the very heart of his commercial enterprise. Moreover, they are the very essence of his trade when the survival of his product depends on success or failure in the experimental stages. Therefore, the information in IDE–0 through IDE–23 is trade secret and confidential commercial information, and is exempt under FOIA Exemption 4.

(f) *IV–F–57*: undated handwritten note to Max Talbott, Executive Secretary of Opthalmic Panel, regarding Establishment Inspection Report ("EIR") (attached to note) on IOLAB Choyce Mark VIII AC lenses made from July 15, 1977, to December 9, 1977. (Plaintiff consents to deletion of patient, physician, and corporate identifiers and rate of production).

*Portions withheld*: (1) number of complaints, (2) lists of complaints, (3) number of complaints, (4) investigator's tally of adverse reactions.

*Corresponding bases advanced for withholding*: (1) would reveal information regarding IDE study, (2) raw data from IDE

study is trade secret information, (3–4) information regarding adverse reactions received as part of IDE study is trade secret and confidential commercial information.

■ *Analysis*: (1), (3): The number of complaints and the number of lenses removed from patients' eyes, identified in conjunction with five months' worth of production of a specific IOLAB lens model would give competitors some idea of the relative success of this particular model. This, in turn, would indicate the advisability *vel non* of imitating certain features of it. Therefore, items (1) and (3) of document IV–F–57 are confidential commercial information exempt from disclosure under FOIA Exemption 4.

■ (2), (4): The list of complaints and the investigator's tally of adverse reactions are confidential commercial information. Their disclosure would benefit competitors at IOLAB's expense because by analyzing the problems encountered by IOLAB, the other manufacturers would be able to foresee probable difficulties and, in anticipation thereof, redirect their research and investigations. Therefore, the list and the tally are confidential commercial information and are exempt under FOIA Exemption 4.

■ (g) *I–GG–1*: May 2, 1978 letter to Executive Secretary of the Opthalmic Panel from BMD Device Evaluation regarding IOLAB lens problems.

*Portion withheld*: Discussion of results of IOLAB IDE study.

*Basis advanced for withholding*: information regarding IDE study is trade secret and confidential commercial information.

*Analysis*: the discussion by an FDA official of the results of a sponsor's IDE study are clearly trade secret and confidential commercial information for the reasons discussed in the analyses under IDE–0 through IDE–24, and IV–F–57(2) and (4).

■ (h) *II–B–2*: October 25, 1978 memorandum of telephone conference between BMD and IOLAB attorney J. A. Jacobs regarding an adverse reaction.

*Portion withheld*: Nature of reported adverse reaction.

*Basis advanced for withholding*: Results of IDE study are trade secret.

*Analysis*: While the nature of a particular reported adverse reaction need not always be considered a trade secret or confidential commercial information, it must be considered as such when it is presented in the context of a discussion between a BMD official and the manufacturer or its attorney. Therefore, the portion of document II–B–1 withheld is exempt from disclosure under FOIA Exemption 4.

■ (i) *II–B–2*: November 8, 1978 memorandum of meeting between *BMD* and *IOLAB* regarding adverse reaction report.

*Portions withheld*: (1) nature of adverse reaction, (2) information regarding IOLAB product line.

*Corresponding bases advanced for withholding*: (1) the results of an IDE study are trade secret information, (2) information regarding product line is confidential commercial information.

*Analysis*: (1) for the reason stated in the analysis under II–B–1, the nature of this adverse reaction is exempt under FOIA Exemption 4. (2) Information regarding a firm's product line is trade secret and confidential commercial information. Of all the information sought in this lawsuit, this item is perhaps one of the most obviously exempt under FOIA Exemption 4.

■ (j) *IV–D–6*: July 12, 1978 memorandum to Leonard Hessen from Max Talbott, Executive Secretary of Opthalmic Panel, regarding Coburn recall of reprocessed lenses.

*Portions withheld*: (1) number of reprocessed lenses implanted, (2) percentages of adverse reactions from reprocessed and unreprocessed lenses.

*Basis advanced for withholding*: Information regarding a firm's IDE study is trade secret and confidential commercial information.

*Analysis*: (1) the number of reprocessed lenses implanted by a company is sales information, and as such is confidential commercial information. Substantial competitive injury is likely to befall a manufacturer who is forced to disclose the sales volume of a particular item in his product line. "Disclosure would provide competitors with valuable insights ... while the [competitors] could continue in the customary manner of 'playing their cards close to their chest.'" *National Parks II, supra,* at 684. (2) The percentages of adverse reactions from reprocessed and unreprocessed lenses are trade secret information because they provide valuable insights into the feasibility and profitability *vel non* of reprocessing IOLs. Therefore, both withheld portions of document IV–D–6 are exempt from disclosure under FOIA Exemption 4.

■ (k) *IV–D–8*: October 6, 1978 memorandum to Associate Commissioner for Regulation Affairs from BMD Director for Compliance regarding FDA requested recall of Coburn resterilized lenses.

*Portions withheld*: number of resterilized lenses implanted.

*Basis advanced for withholding*: would disclose information regarding Coburn IDE study which is trade secret information.

*Analysis*: for the reasons analogous to those stated in the analysis under IV–D–6(1), the number of resterilized lenses implanted is exempt under FOIA Exemption 4.

■ (l) *III–1 through III–16*: FDA letters from October, 1978, to August, 1979, giving the IOL manufacturers approval to export the devices.

*Portions withheld*: whole documents.

*Basis advanced for withholding*: the letters contain the identity of the sponsor, the country of export, and, in some cases, the number of lenses, all of which is confidential commercial information.

*Analysis*: the information at issue here constitutes sales and marketing data, which is commercial information. Substantial competitive injury is likely, especially when

one considers the international—particularly European and Japanese—composition of the IOL industry. Therefore, documents III–1 through III–16 are exempt from disclosure under FOIA Exemption 4.

In summary then, the Court has held that the following documents are exempt from disclosure under FOIA Exemption 4: V–3(3); VI–1; IDE–24; IDE–0 through IDE–23; IV–F–57; I–GG–1; II–B–1; II–B–2; IV–D–6; IV–D–8; III–1 through III–16. Conversely, the Court has held that the following group of documents are *not* exempt from disclosure under FOIA Exemption 4: V–3(1) and (2); VI–2.

In this regard, the Court would like to point out that while it has ruled that certain items are trade secret or confidential commercial information at this point in the industry's development, they could conceivably lose that protected status over time. For example, when the time arrives for the FDA advisory committee to publish "a detailed summary of information respecting the safety and effectiveness" of IOLs pursuant to 21 U.S.C. § 360j(h), the disclosure of certain commercial information may no longer be likely to result in substantial competitive injury, and what is now a trade secret may be common knowledge. Until such fundamental changes in the industry occur, however, the Court's ruling stands.

The Court also wishes to note that FDA has more than once guaranteed that information submitted on experimental medical devices would be kept confidential. *See, e.g.,* 21 C.F.R. §§ 314.14, 813.38.

■ Finally, section 520(c) of the Medical Device Amendments Act of 1976, 21 U.S.C. § 360j(c) provides that information reported to FDA for purposes of obtaining approval for medical devices and which is exempt from disclosure by reason of FOIA Exemption 4 "shall be considered confidential and shall not be disclosed." This is a mandatory withholding statute and thus FDA has no discretion on the issue of whether or not to withhold trade secret or confidential commercial information.

In addition to FOIA Exemption 4, there exists a separate and independent basis for

nondisclosure of the information at issue in this action—FOIA Exemption 3.

> (b) This section [5 U.S.C. § 552] does not apply to matters that are—
>
> > (3) specifically exempted from disclosure by statute ... provided that such statute (A) requires that the matters be withheld from the public in such a manner as to leave no discretion on the issue, or (B) establishes particular criteria for withholding or refers to particular types of matters to be withheld.

5 U.S.C. § 552(b)(3).

The exempting statute applicable here is § 520(h) of the Medical Device Amendments of 1976, 21 U.S.C. § 360j(h). This Court has already ruled, regarding Count II of the complaint in this case, that § 520(h) is not applicable during this clinical test period to require FDA dissemination of summary safety information. Order of February 20, 1981. The Court reaffirms that holding today. There is still no dispute today regarding the fact that the federal defendants have not issued any of the orders described in § 520(h)(1). As the Court held in its Order of February 20, 1981, such an administrative order is necessary to trigger the requirement that summaries of safety and effectiveness information be released. These summaries "shall be made available pursuant to this paragraph only after the issuance of the [administrative] order." 21 U.S.C. § 360j(h)(2). The reason Congress provided that release of these summaries should not occur until issuance of the appropriate administrative order was to guarantee confidentiality to the submitters of information on experimental medical devices. Congress made it very clear in the legislative history of this provision that these summaries were to be made available to the public only after an administrative order described in § 360j(h)(1) was issued, but not before that time. *See* April 23, 1976 Letter of FDA Chief Counsel R. A. Merrill, inserted in 122 *Cong.Rec.* S 7287 (daily edition, May 13, 1976), Senator Taft, and 122 *Cong.Rec.* H 4384 (daily edition, May 13, 1976), Rep. Rogers. *See also* H.R. Rep.No.94–853, *supra*, at 48–51 (1976).

In the instant case, the Court is faced with the additional wrinkle that the information sought is not an administratively prepared summary as described in 21 U.S.C. § 360j(h)(1), but rather the original documents on which the summaries would presumably be based once they are prepared. However, it would defy logic to say that the original documents are not exempted from disclosure when summaries prepared from them would be. The same concerns of protecting confidentiality of the information apply even more strongly to the raw data in the original documents submitted by the manufacturers.

Thus, in addition to holding that some of the documents are exempt under FOIA Exemption 4, the Court must also hold that *all* of the documents are exempt from disclosure under FOIA Exemption 3 by reason of 21 U.S.C. § 360j(h)(2), at least until an administrative order described in 21 U.S.C. § 360j(h)(1) is issued.

In conclusion, then, the Court holds today that all of the documents sought are exempt under FOIA Exemption 3, and, in addition, as previously stated, that all of the documents except VI–2 and V–3(1) and (2) are also exempt under FOIA Exemption 4. Therefore, the defendants are, as a matter of law, entitled to summary judgment in this case, and the complaint must be dismissed.