**PUBLIC CITIZEN HEALTH RESEARCH GROUP, Appellant,**

v.

**FOOD AND DRUG ADMINISTRATION, et al.**

No. 82–1745.

United States Court of Appeals, District of Columbia Circuit.

Argued Jan. 21, 1983.

Decided April 15, 1983.

David C. Vladeck, Washington, D.C., with whom Alan B. Morrison, Washington, D.C., was on the brief, for appellant.

Jeffrey Gibbs, Sp. Asst. U.S. Atty., Rockville, Md., of the Bar of the Supreme Court of New Jersey, pro hac vice, by special leave of Court, with whom Stanley S. Harris, U.S. Atty., Royce C. Lamberth and R. Craig Lawrence, Asst. U.S. Attys., and Thomas Scarlett, Chief Counsel, Food and Drug Admin., Washington, D.C., were on the brief, for appellees, Food and Drug Admin., et al. Patricia J. Kenney, Asst. U.S. Atty., Washington, D.C., also entered an appearance for Food and Drug Admin., et al.

Jerald A. Jacobs, Washington, D.C., with whom Richard F. Mann and Glenn P. Sugameli, Washington, D.C., were on the brief, for appellees, CILCO, Inc., et al. Richard J. Leighton, Washington, D.C., also entered an appearance for appellees, CILCO, Inc., et al.

Before EDWARDS and SCALIA, Circuit Judges, and VAN DUSEN,* Senior Circuit Judge, United States Court of Appeals for the Third Circuit.

Opinion for the Court filed by Circuit Judge HARRY T. EDWARDS.

HARRY T. EDWARDS, Circuit Judge:

This Freedom of Information Act ("FOIA" or "Act") case involves an appeal from a grant of summary judgment against the Public Citizen Health Research Group ("HRG"), a nonprofit organization engaged in research and consumer advocacy on health and safety matters. The prevailing parties were the Food and Drug Administration ("FDA"), the agency in possession of the records the HRG seeks, the Department of Health and Human Services ("HHS"), which is responsible for reviewing FDA denials of FOIA requests, and various manufacturers of intraocular lenses ("IOLs"), who submitted the data requested by the HRG to the FDA as part of the agency's investigation of IOLs. The District Court held that the requested records, which were produced during ongoing clinical studies of the safety and efficacy of IOLs, are immune from disclosure under Exemptions 3 and 4 of the FOIA. These exemptions allow agencies to withhold, respectively, (1) records that are "specifically exempted from disclosure by statute" if the relevant statute satisfies one of two limiting conditions and (2) "trade secrets and commercial or financial information obtained from a person and privileged or confidential."[1] The effect of the trial court's decision was to shield from disclosure data relating to the incidence of adverse reactions and complications associated with IOLs.

We believe that the District Court erred in its application of Exemption 3 and adopted an overly broad construction of the term "trade secrets" in Exemption 4. With respect to most of the documents, however, these errors are of little consequence since the District Court properly concluded that the records contain confidential "commercial information." But we have questions concerning the confidentiality of certain of the requested documents. Accordingly, we affirm in part, reverse in part, and remand the case for further proceedings consistent with this opinion.

I. BACKGROUND

Exercising the authority conferred on it by the Medical Device Amendments of

---

* Sitting by designation pursuant to 28 U.S.C. § 294(d) (Supp. V 1981).

1. 5 U.S.C. § 552(b)(3), (4) (1976).

1976,[2] the FDA in 1977 classified IOLs—disks implanted in patients' eyes to correct vision following the removal of cataracts—as investigational devices available only under conditions designed to allow well-controlled clinical evaluations of their safety and efficacy.[3] Although the devices had been widely used for a number of years, the FDA concluded that further study was necessary to confirm their effectiveness and safety. As a result, manufacturers of IOLs, while still able to market the devices, are required to submit voluminous data to the FDA, including information concerning their prior experience with IOLs[4] and detailed reports on adverse reactions and other complications.[5] Portions of these clinical test results are the subject of the current controversy.

The events leading to this appeal commenced on February 22, 1979, when the HRG, seeking information to assist it in monitoring the FDA's regulation of IOLs and promoting public understanding of the advantages and risks of IOLs, filed a number of FOIA requests covering much of the clinical test information submitted by the manufacturers to the FDA. These requests later were narrowed and, still later, were partially granted and partially denied by the FDA. At issue on this appeal are two undated summary reports of complications and adverse reactions in IOL studies, an adverse reaction summary log, several thousand adverse reaction reports, data on study sponsors' prior experience with IOLs, a note pertaining to an inspection report, a letter

written by an official of the FDA regarding problems with one manufacturer's IOLs, memorandums of a telephone conference and a meeting in which the participants discussed adverse reactions, two memorandums concerning recalls of one manufacturer's lenses, and letters approving the export of IOLs. The withholding of these documents was justified on the ground that the requested information constituted "trade secrets" within the meaning of Exemption 4, as defined by the FOIA regulations of the FDA.[6] The HRG appealed the FDA's decision to HHS, but received no answer. It then filed an action in the District Court in July 1979 to compel disclosure under the FOIA and 21 U.S.C. § 360j(h) (1976). The HRG now pursues only its FOIA claim.

The District Court prefaced its assessment of that FOIA claim with a general discussion of the standards governing release under Exemption 4. Following the lead of the FDA, the court defined "trade secrets" by reference to the definition set forth in section 757 of the *Restatement of Torts.*[7] It noted correctly, moreover, that "once a document ... is determined to be a trade secret, the inquiry ends there and the document is exempt from the requirements of FOIA." *Public Citizen Health Research Group v. FDA,* 539 F.Supp. 1320, 1325 (D.D.C.1982). If a document does not contain trade secrets, the District Court continued, it is necessary to consider whether disclosure would reveal exempt "commercial or financial information" under the test adopt-

2. Pub.L. No. 94–295, 90 Stat. 539 (codified in pertinent part at 21 U.S.C. §§ 360c–360k (1976)).

3. *See* 42 Fed.Reg. 58,874, 58,874–75 (1977); 41 Fed.Reg. 38,802, 38,803 (1976).

4. *See* 21 C.F.R. § 813.27 (1982).

5. *See* 21 C.F.R. § 813.153(b) (1982).

6. *See* 21 C.F.R. § 20.61(a) (1982).

7. That definition provides, in part, that "[a] trade secret may consist of any formula, pattern, device or compilation of information which is used in one's business, and which gives him an opportunity to obtain an advantage over competitors who do not know or use

it." 4 RESTATEMENT OF TORTS § 757 comment b (1939). Interestingly, particularly in view of our disposition of this case, this broad statement was immediately qualified somewhat by the drafters of the *Restatement:*

It may be a formula for a chemical compound, a process of manufacturing, treating or preserving materials, a pattern for a machine or other device, or a list of customers.... A trade secret is a process or device for continuous use in the operation of the business. Generally it relates to the production of goods, as, for example, a machine or formula for the production of an article. It may, however, relate to the sale of goods or to other operations in the business ....
*Id.*

ed by this court in *National Parks & Conservation Association v. Morton*, 498 F.2d 765 (D.C.Cir.1974) (*"National Parks I"*), and refined in *National Parks & Conservation Association v. Kleppe*, 547 F.2d 673 (D.C.Cir.1976) (*"National Parks II"*), and *Gulf & Western Industries v. United States*, 615 F.2d 527 (D.C.Cir.1979).

The District Court then proceeded to analyze the applicability of Exemption 4 to each of the requested documents. Several were found to reveal neither trade secrets nor confidential commercial information; several were characterized as including commercial information; and many were held to contain both trade secrets and confidential commercial information. These conclusions rested largely on the District Court's determinations whether substantial competitive injury would result from the disclosure of each document. The theory underlying the withholding of most of the information was that the manufacturers "would sustain substantial competitive injury because their competitors would be receiving, free of charge, the benefits of [their] costly research and testing." 539 F.Supp. at 1327.

The District Court finally held that those documents not immune from disclosure under Exemption 4 could be withheld under Exemption 3. Section 520(h) of the Medical Device Amendments, 21 U.S.C. § 360j(h) (1976), the court found, satisfied the stringent conditions necessary to qualify as a withholding statute under Exemption 3. The District Court held, therefore, that "*all* of the documents are exempt from disclosure under FOIA Exemption 3 by reason of 21 U.S.C. § 360j(h)(2), at least until an administrative order described in 21 U.S.C. § 360j(h)(1) is issued." 539 F.Supp. at 1331 (emphasis in original).

## II. DISCUSSION

### A. *Exemption 3*

We begin our analysis with the broadest of the District Court's holdings. To invoke Exemption 3, an agency must demonstrate that (1) a statute exists and was in effect at the time of the request; (2) the statute

either requires that matters be withheld from the public "in such a manner as to leave no discretion on the issue," or "establishes particular criteria for withholding or refers to particular types of matters to be withheld," 5 U.S.C. § 552(b)(3) (1976); and (3) the records in question are among those covered by the statute. *See American Jewish Congress v. Kreps*, 574 F.2d 624, 628–30 (D.C.Cir.1978); 1 J. O'REILLY, FEDERAL INFORMATION DISCLOSURE § 13.02 (1982). In this case, the District Court and the corporate appellees argue that 21 U.S.C. § 360j(h) (1976) is an Exemption 3 statute and that *all* of the requested documents are exempt from disclosure. We disagree.

Section 360j(h) establishes a scheme under which the FDA must make available to the public "a detailed summary of information respecting the safety and effectiveness of a device which information was submitted to the [agency] and which was the basis for" specified orders or was submitted to an advisory committee and formed the basis for its recommendations to the FDA. These *summaries*, the statute makes clear, are to be released only *after* the issuance of one of the specified orders. Because the FDA has not yet issued such an order, the District Court concluded that section 360j(h) barred disclosure of the *raw data* submitted by the manufacturers that eventually would be included in an agency-compiled summary: "Congress provided that release of these summaries should *not occur* until issuance of the appropriate administrative order ... to guarantee confidentiality to the submitters of information ... [and] it would defy logic to say that the original documents are not exempted from disclosure when summaries prepared from them would be." 539 F.Supp. at 1331.

Although the District Court's initial reading of the statute is not wholly implausible, we think that it is contradicted by the language of section 360j(h), its legislative history, and its interrelation with other provisions of the Medical Device Amendments. First, even a cursory reading of section 360j(h) clearly reveals that (1) it is primari-

ly, if not exclusively, a disclosure statute and (2) it makes no reference whatsoever to the raw data on which the FDA's summaries presumably will be based. The statute does, to be sure, control the timing of disclosure of those summaries, but that does not, in itself, compel a conclusion that raw data constituting neither trade secrets nor confidential commercial information cannot be disclosed either before or after the release of agency-prepared summaries. On its face, then, section 360j(h) does not exempt from disclosure raw data submitted by IOL manufacturers.

This conclusion is consistent with, indeed demanded by, the legislative history of section 360j(h), which, when read carefully, makes clear that the section was in no way designed to impose limits on public access to health and safety data submitted by manufacturers of medical devices over and above those imposed by the FOIA and the Trade Secrets Act ("TSA").[8] In balancing the costs and benefits of disclosure, Congress recognized that "the best interests of government, industry and the public are served by proper public scrutiny of actions of the [FDA]." However, Congress also was aware that "[p]ublic scrutiny ... would normally be difficult, since some decisions with respect to class III devices will be based upon trade secret information." H.R.Rep. No. 853, 94th Cong., 2d Sess. 51 (1976).[9] To mitigate this problem, Congress in section 360j(h) required the FDA to release to the public "a detailed summary of information respecting the safety and effectiveness of a device, which was the basis for major decisions made by [the agency]

with respect to such a device." *Id.* To the extent that a decision was based on trade secret information, a determination wholly unaffected by section 360j(h), public evaluation of the decision will be based solely on agency-prepared summaries of information submitted by manufacturers. But the legislative history repudiates the proposition that section 360j(h) specifically prohibits the disclosure of health and safety data that do not qualify for protection under Exemption 4 to the FOIA or the TSA.

That proposition is further discredited when section 360j(h) is examined in light of its companion provision, 21 U.S.C. § 360j(c) (1976).[10] Under the District Court's interpretation of section 360j(h), all information submitted by manufacturers would be exempt from disclosure under the FOIA, at least until the FDA issued one of the final orders specified in the section.[11] This interpretation, however, renders superfluous a major aspect of section 360j(c), under which the confidential status of information obtained by the FDA is determined solely by reference to FOIA Exemption 4. We have carefully considered the plain language of sections 360j(c) and 360j(h) and their legislative history and have found no reason to depart from the principle of statutory construction favoring interpretations that give effect to every provision of a statute so that no part is rendered "inoperative or superfluous, void or insignificant." 2A C. Sands, Statutes and Statutory Construction § 46.06 (4th ed. 1973); *see, e.g., In re Surface Mining Regulation Litigation,* 627 F.2d 1346 (D.C.Cir.1980).

8. 18 U.S.C. § 1905 (Supp. V 1981).

9. As we read the legislative history, Congress neither approved nor disapproved the FDA's interpretation of "trade secrets," but left the matter open to judicial resolution. *See* note 20 *infra* and accompanying text.

10. Section 360j(c) provides, in part:
Any information reported to or otherwise obtained by the Secretary or his representative under section 360c, 360d, 360e, 360f, 360h, 360i, or 374 of this title or under subsection (f) or (g) of this section which is exempt from disclosure pursuant to subsection (a) of section 552 of title 5 by reason of

subsection (b)(4) of such section shall be considered confidential and shall not be disclosed . . . .
21 U.S.C. § 360j(c) (1976); *see also* 21 U.S.C. § 379 (1976) (providing for disclosure of information protected by Exemption 4 under certain circumstances).

11. This limitation, in fact, is questionable. If section 360j(h) specifically prohibits the disclosure of raw data submitted by manufacturers, it is difficult to comprehend how the release of a summary of those data upon the issuance of a final order would change their exempt status.

We hold, therefore, that section 360j(h) does not specifically prohibit the disclosure of raw data submitted by manufacturers to the FDA. In our opinion, the section was designed solely to ensure public access to summaries of that data notwithstanding the existence of trade secret protection. But section 360j(h) does not bear at all on the question whether raw data contain trade secrets, and it cannot fairly be read as providing an independent basis for nondisclosure of otherwise unprotected health and safety information.

## B. *Exemption 4*

The District Court's holdings concerning Exemption 4 present more troubling questions. As the District Court recognized, this exemption applies to the health and safety data submitted by the IOL manufacturers if those data satisfy one of two statutory criteria. If the requested documents constitute "trade secrets," they are exempt from disclosure, and no further inquiry is necessary. *See National Parks I,* 498 F.2d at 766. If the health and safety data represent only "commercial information," their exempt status turns on the sufficiency of the appellees' showing of confidentiality. And if the documents contain neither trade secrets nor commercial information, Exemption 4 is wholly inapplicable.[12]

### 1. *Trade Secrets*

We turn first to the question whether the requested health and safety data constitute trade secrets, a question we regard as both unresolved and difficult. The FOIA, like the TSA, the Food, Drug and Cosmetic Act,[13] the Medical Device Amendments, and most other federal statutes affording protection to trade secrets, contains no definition of the term.[14] The legislative history of the FOIA is similarly unhelpful. Although Congress clearly indicated that Exemption 4 *as a whole* could cover such materials as "business sales statistics, inventories, customer lists, [and] scientific or manufacturing processes or developments," H.R. REP. No. 1497, 89th Cong., 2d Sess. 10, *reprinted in* 1966 U.S.CODE CONG. & AD.NEWS 2418, 2427, it offered no guidance concerning which prong of the exemption would protect each of these diverse types of information. In many areas such an omission to define a term well known in the common law would only cause minor inconvenience; courts could simply assume that Congress intended the term to bear its common law meaning in the absence of evidence to the contrary. *See* 2A C. SANDS, *supra,* at § 50.03. Here, however, we encounter substantial problems because the term "trade secrets" has been defined both broadly and narrowly at common law.

One "widely relied-upon definition," *Kewanee Oil Co. v. Bicron Corp.,* 416 U.S. 470, 474, 94 S.Ct. 1879, 1882, 40 L.Ed.2d 315 (1974), initially promulgated by the drafters of the *Restatement of Torts, see* note 7 *supra,* has been adopted verbatim by the FDA and sanctioned by the District Court. Under this broad definition, "[a] trade secret may consist of any formula, pattern, device, or compilation of information which is used in one's business and which gives him an opportunity to obtain an advantage over competitors who do not know or use it." 21 C.F.R. § 20.61(a) (1982). Strictly applied, "this definition would classify virtually all undisclosed health and safety testing data as trade secrets."[15]

The *Restatement* definition has achieved acceptance in a variety of private law contexts, *see* 1 R. MILGRIM, TRADE SECRETS § 2.01 (1982); however, it is far from clear that Congress intended it to govern in FOIA cases. A number of courts had adopted a more restrictive definition of trade secrets prior to the adoption of the FOIA. Under the restrictive definition,

---

**12.** The appellees have not argued that the requested information is "financial" in nature.

**13.** *See* 21 U.S.C. § 331(j) (Supp. V 1981) (prohibiting disclosure or use of trade secrets).

**14.** McGarity & Shapiro, *The Trade Secret Status of Health and Safety Testing Information: Reforming Agency Disclosure Policies,* 93 HARV. L.REV. 837, 861 (1980).

**15.** McGarity & Shapiro, *supra* note 14, at 862.

trade secret status is reserved for information involving "the productive process itself, as opposed to collateral matters of business confidentiality such as pricing and sales volume data, sources of supply and customer lists." [16] This restrictive approach, in fact, was adopted in the only pre-FOIA case of which we are aware that had defined trade secrets under the federal TSA, a source to which we assume Congress surely would have looked. *See United States ex rel. Norwegian Nitrogen Products Co. v. United States Tariff Commission,* 6 F.2d 491, 495 (D.C.Cir.1925), *vacated as moot,* 274 U.S. 106, 47 S.Ct. 499, 71 L.Ed. 949 (1927).[17] Under this definition, a trade secret is " 'an unpatented, commercially valuable plan, appliance, formula, or process, which is used for the making, preparing, compounding, treating, or processing of articles or materials which are trade commodities.' " *Consumers Union v. Veterans Administration,* 301 F.Supp. 796, 801 (S.D.N.Y.1969) (quoting *Norwegian Nitrogen,* 6 F.2d at 495), *appeal dismissed,* 436 F.2d 1363 (2d Cir. 1971). A court following this approach, it seems clear, would not extend trade secret protection to health and safety data submitted to the FDA.

█ In deciding between these competing definitions of trade secret, we begin with two observations, each of which suggests that our choice is relatively unconstrained by prior administrative or judicial

actions. First, although the FDA has endorsed the *Restatement* definition and adopted it in its FOIA regulations, we are not bound by the agency's interpretive regulation. Any other conclusion would produce an intolerable situation in which different agencies could adopt inconsistent interpretations of the FOIA and substantially complicate the administration of the Act. The FDA's expertise in this area should not be wholly discounted. *See Pharmaceutical Manufacturers Association v. Weinberger,* 411 F.Supp. 576, 578 (D.D.C.1976). But Congress has made clear both that the federal courts, and not the administrative agencies, are ultimately responsible for construing the language of the FOIA, *see* 5 U.S.C. § 552(a)(4)(B) (1976), and that agencies cannot alter the dictates of the Act by their own express or implied promises of confidentiality, *see Petkas v. Staats,* 501 F.2d 887, 889 (D.C.Cir.1974). The longstanding nature of the FDA's interpretation of the trade secret concept under the Food, Drug and Cosmetic Act [18] does not demand a different conclusion. Not only has that interpretation been seriously questioned by commentators both within and without the agency,[19] but Congress apparently recognized the controversy when enacting the Medical Device Amendments and left the question open for judicial resolution.[20]

16. Connelly, *Secrets and Smokescreens: A Legal and Economic Analysis of Government Disclosures of Business Data,* 1981 Wis.L.Rev. 207, 230.

17. The *Norwegian Nitrogen* court actually interpreted § 708 of a 1916 revenue act that was combined with two other statutes and recodified in 1948 as the TSA. For a brief history of the enactment of the TSA, see *Chrysler Corp. v. Brown,* 441 U.S. 281, 296–98, 99 S.Ct. 1705, 1714–15, 60 L.Ed.2d 208 (1979).

18. *See Business Record Exemption of the Freedom of Information Act: Hearings Before a Subcomm. of the House Comm. on Government Operations,* 95th Cong., 1st Sess. 70–71 (1977) (testimony of FDA Commissioner Kennedy) [hereinafter cited as *Business Record*].

19. *See, e.g.,* Department of Health, Education, and Welfare, Final Report of the Review Panel on New Drug Regulation (1977), *reprinted in part*

in Plaintiff's Reply Memorandum, Record 148, App. B; McGarity & Shapiro, *supra* note 14, at 886–87. We need not pass on the correctness of this definition to resolve this appeal, but it does seem inconsistent with the language of the Food, Drug and Cosmetic Act, which merely forbids the disclosure or use for personal advantage of "any information ... concerning any *method or process* which as a trade secret is entitled to protection." 21 U.S.C. § 331(j) (Supp. V 1981) (emphasis added).

20. *See* H.R.Rep. No. 853, *supra,* at 50:

The Committee recognizes that the question of what constitutes a trade secret which is to enjoy protection under the Federal Food, Drug, and Cosmetic Act and other statutes has been the subject of litigation, and further litigation is likely in the future. The provisions of the bill are not intended ... to alter in any way existing law respecting what constitutes a trade secret. The Committee

Prior judicial decisions also need not detain us unduly. An examination of the case law reveals that evaluations of routine medical services performed by a Professional Standards Review Organization ("PSRO"), *see Public Citizen Health Research Group v. Department of Health, Education & Welfare,* 477 F.Supp. 595, 605 (D.D.C.1979), *rev'd on other grounds,* 668 F.2d 537 (D.C.Cir.1981), and noncommercial scientists' research designs, *see Washington Research Project, Inc. v. Department of Health, Education & Welfare,* 504 F.2d 238, 244–45 (D.C.Cir.1974), *cert. denied,* 421 U.S. 963, 95 S.Ct. 1951, 44 L.Ed.2d 450 (1975), have been held not to constitute trade secrets. But those holdings turned primarily on the noncommercial or noncompetitive nature of the activities at issue, and not on a careful analysis of what types of business information could constitute trade secrets.[21] Concededly, the *Washington Research Project* court did cite the *Restatement* definition, *see* 504 F.2d at 245 n. 8, and several other courts have also used this definition in Exemption 4 cases, *see Union Oil Co. v. Federal Power Commission,* 542 F.2d 1036, 1044 (9th Cir.1976); *St. Paul's Benevolent*

*Educational & Missionary Institute v. United States,* 506 F.Supp. 822, 830 (N.D.Ga. 1980).[22] But the courts' application of this broad interpretation of trade secrets has been mechanical, and they have given no consideration to its suitability in FOIA cases. As a result, the persuasive force of these prior decisions is minimal.

■ Since we are bound by neither the agency's interpretation nor judicial precedent, we feel free to repudiate the broad *Restatement* approach and the FDA's regulation as inconsistent with the language of the FOIA and its underlying policies. In our opinion, the term "trade secrets" in Exemption 4 of the FOIA should be defined in its narrower common law sense, which incorporates a direct relationship between the information at issue and the productive process. Accordingly, we define trade secret, solely for the purpose of FOIA Exemption 4, as a secret, commercially valuable plan, formula, process, or device that is used for the making, preparing, compounding, or processing of trade commodities and that can be said to be the end product of either innovation or substantial effort.[23]

21. *Cf. Amchem Prods., Inc. v. GAF Corp.,* 594 F.2d 470, 481 (5th Cir.) (assuming without deciding that scientific test data contained in an application filed with the Environmental Protection Agency may under some circumstances constitute trade secrets), *modified,* 602 F.2d 724 (5th Cir.1979) (per curiam).

22. The *Restatement* definition has also been used, without critical analysis, by courts interpreting other federal statutes affording protection to trade secrets. *See, e.g., Carson Prods. Co. v. Califano,* 594 F.2d 453, 460–62 (5th Cir. 1979) (upholding FDA decision that an ingredient was not a trade secret); *Zotos Int'l, Inc. v. Kennedy,* 460 F.Supp. 268, 272 (D.D.C.1978) (using *Restatement* approach in a labeling case); *Mobay Chem. Corp. v. Costle,* 447 F.Supp. 811, 824–27, 834–35 (W.D.Mo.1978) (using *Restatement* definition in case under the Federal Insecticide, Fungicide, and Rodenticide Act), *appeal dismissed,* 439 U.S. 320, 99 S.Ct. 644, 58 L.Ed.2d 549 (1979) (per curiam), *aff'd sub nom. Mobay Chem. Corp. v. Gorsuch,* 682

F.2d 419 (3d Cir.), *cert. denied,* —— U.S. ——, 103 S.Ct. 343, 74 L.Ed.2d 384 (1982); *Ashland Oil, Inc. v. FTC,* 409 F.Supp. 297, 303–04 (D.D.C.) (applying *Restatement* definition to § 6(f) of the FTC Act), *aff'd,* 548 F.2d 977 (D.C.Cir.1976) (per curiam). *See also Chevron Chem. Co. v. Costle,* 443 F.Supp. 1024, 1031–32 (N.D.Cal.1978) (looking to *Restatement* factors in pesticide case, but noting that other factors, such as the policies underlying the legislation and the need to protect public health and the environment, are also relevant).

does expect that, where appropriate, data submitted in connection with medical devices should be granted such confidential status as is required by law to be granted with respect to data submitted with new drug applications.

23. *See Consumers Union v. Veterans Admin.,* 301 F.Supp. at 801; *Business Record, supra* note 18, at 72 (testimony of FDA Commissioner Kennedy) (distinguishing between data relating to processes and methods, which are the product of private innovation and deserve protection, and safety and efficacy data, which are in the public interest to disclose); Connelly, *supra* note 16, at 235; Project, *Government Information and the Rights of Citizens,* 73 MICH.L.REV. 971, 1063 n. 619 (1975); *cf. Covey Oil Co. v. Continental Oil Co.,* 340 F.2d 993, 999 (10th Cir.) (distinguishing between secret processes and other business data under Federal Rule of Civil Procedure 26(c)), *cert. denied,* 380 U.S. 964, 85 S.Ct. 1110, 14 L.Ed.2d 155 (1965).

This definition, we believe, hews more closely to the language and legislative intent of the FOIA than does the *Restatement* approach.

Several arguments support this conclusion. First, we have found no evidence in the debates and reports leading to the enactment of the FOIA militating in favor of a broad definition of "trade secrets." Second, the *Restatement* definition of trade secrets renders meaningless the second prong of Exemption 4. As the House Committee on Government Operations has recognized:

> If a trade secret can be any information used in a business which gives competitive advantage, then there is little or no information left·that could qualify as commercial or financial information under the second category of the exemption without also qualifying as a trade secret. *This definition is therefore inconsistent with the language of the act,* as well as with the general approach taken by the

courts to the concept of confidential business information.

H.R.REP. No. 1382, 95th Cong., 2d Sess. 16 (1978) (emphasis added).[24] Tellingly, when asked in the oral argument before this court to specify a category of information that would be included in the "commercial or financial information" prong of Exemption 4 but not in the FDA's definition of trade secrets, counsel for the federal appellees could not give a single example. Third, the *Restatement* definition, tailored as it is to protecting businesses from breaches of contract and confidence by departing employees and others under fiduciary obligations is ill-suited for the public law context in which FOIA determinations must be made.[25] The scant and inconsistent evidence of the intent of the 89th Congress—which enacted the FOIA—that can be gleaned from the statements of subsequent Congresses does not detract from the force of these arguments.[26]

**24.** *But see* S.REP. No. 838, 92nd Cong., 2d Sess., pt. II, at 72, *reprinted in* 1972 U.S.CODE CONG. & AD.NEWS 4023, 4091–92 (giving general approval to *Restatement* definition of trade secret in legislation also protecting commercial or financial information).

**25.** [T]he common law definition was tailored to private contexts where public policy almost exclusively focuses on the unjust enrichment and competitive harm resulting when someone acquires a business intangible through the breach of a contract or a confidential relationship. The essence of the common law concept of trade secret is thus wrongdoing on the part of the defendant. Although on rare occasions a court will suggest that the common law of trade secrets encourages research and innovation, the *Restatement* eschews any policy of encouraging innovation.

When the question of defining proprietary information appears in the public context of whether health and safety data submitted to an agency should be publicly disclosed, the interests of the public in disclosure and the protection of innovation incentives pose important considerations which the common law definition was not designed to handle. The *Restatement* approach, with its emphasis on culpability and misappropriation, is ill-equipped to strike an appropriate balance between the competing interests of regulated industries and the general public. Therefore, lumping health and safety testing data with all other types of proprietary information is inherently suspect.

McGarity & Shapiro, *supra* note 14, at 863 (footnotes omitted). The narrower common law approach that we adopt is, of course, subject to a similar objection, but, by limiting the category of information that automatically falls within Exemption 4, it allows agencies greater freedom in balancing the relevant interests of submitters of information and the public. *Cf. Chevron Chem. Co. v. Costle,* 443 F.Supp. 1024, 1031–32 (N.D.Cal.1978) (Congress was concerned with common law elements of trade secrets in pesticide legislation, but other factors pertaining to public health and safety are also relevant).

**26.** "In evaluating the weight to be attached to these statements, we begin with the oft-repeated warning that 'the views of a subsequent Congress form a hazardous basis for inferring the intent of an earlier one.'" *Consumer Prod. Safety Comm'n v. GTE Sylvania, Inc.,* 447 U.S. 102, 117, 100 S.Ct. 2051, 2060, 64 L.Ed.2d 766 (1980) (quoting *United States v. Price,* 361 U.S. 304, 313, 80 S.Ct. 326, 331, 4 L.Ed.2d 334 (1960)).

In the legislative history of the Medical Device Amendments, Congress did mention the *Restatement* definition of trade secrets and indicate its awareness of the FDA's broad definition of the concept. It also suggested that data pertaining to class III medical devices, such as IOLs, should be treated in the same manner as data on new drugs. H.R.REP. No. 853, *supra,* at 48–50. But, given Congress' express recogni-

█ Applying our definition of "trade secrets" to the records at issue on this appeal, we conclude that they are not protected under the first prong of Exemption 4. The relationship of the requested information to the productive process is tangential at best; under no plausible reading of the phrase "plan, formula, process, or device" could the reports, letters, and memorandums sought by the HRG be said to fall within its ambit.[27]

### 2. Confidential Commercial Information

That the requested documents do not contain trade secrets does not mean that they are ineligible for protection under FOIA Exemption 4. Information other than trade secrets falls within the second prong of the exemption if it is shown to be (1) commercial or financial, (2) obtained from a person, and (3) privileged or confidential. *National Parks I,* 498 F.2d at 766. Since there is no question that the documents at issue were submitted by a person and no allegation that the information they contain is financial or privileged, we need ask only whether that information is commercial and, if so, whether it is confidential.

█ Concerning the first question, the appellants argue strenuously that the commercial information provision of Exemption 4 should be confined to records that actually reveal basic commercial operations, such as sales statistics, profits and losses, and inventories, or relate to the income-producing aspects of a business. We agree that

not every bit of information submitted to the government by a commercial entity qualifies for protection under Exemption 4,[28] but we have consistently held that the terms "commercial" and "financial" in the exemption should be given their ordinary meanings. *See Washington Post Co. v. United States Department of Health & Human Services,* 690 F.2d 252, 266 (D.C.Cir. 1982); *Board of Trade v. Commodity Futures Trading Commission,* 627 F.2d 392, 403 (D.C.Cir.1980). In rejecting the argument that a noncommercial scientist's research design was an item of commercial information, moreover, we have recognized the possibility that "an individual . . . engaged in profit-oriented research . . . could conceivably be shown to have a commercial or trade interest in his research design." *Washington Research Project,* 504 F.2d at 244 n. 6. Because documentation of the health and safety experience of their products will be instrumental in gaining marketing approval for their products, it seems clear that the manufacturers of IOLs have a commercial interest in the requested information.

█ The relevant question thus becomes whether the commercial information submitted to the FDA by the IOL manufacturers is "confidential" within the meaning of Exemption 4. Commercial information is confidential for purposes of the exemption if its disclosure would either "(1) . . . impair the Government's ability to obtain necessary information in the future; or (2) . . . cause substantial harm to the competi-

tion of legal challenges to the FDA's broad definition and its decision to leave the ultimate resolution of those challenges to the courts, *see* note 20 *supra,* we may infer that its statements about class III devices evince a desire for consistency rather than a judgment about the degree of protection to be afforded. This inference is consistent with the 1978 Report of the House Committee on Government Operations, which condemned the *Restatement* definition as inconsistent with the language of the FOIA and endorsed the *Consumers Union* approach as "one more suitable for FOIA." H.R.Rep. No. 1382, *supra,* at 16.

**27.** It bears repeating that the definition of "trade secrets" that we have adopted is tailored to Exemption 4 of the FOIA, and that we intend our opinion to suggest nothing concerning the meaning of the term in other contexts.

**28.** *Cf. Public Citizen Health Research Group v. Department of Health, Educ. & Welfare,* 477 F.Supp. at 605 (in-depth medical service reviews prepared by PSRO, which contain "no data concerning fees, payment schedules, or other commercial arrangements [and] . . . no information about secret formulas or rare treatment methods," are not commercial information).

tive position of the person from whom the information was obtained." *National Parks I,* 498 F.2d at 770 (footnote omitted). Under the second prong of this test—the only one at issue here[29]—the court need not conduct a sophisticated economic analysis of the likely effects of disclosure. *National Parks II,* 547 F.2d at 681. Conclusory and generalized allegations of substantial competitive harm, of course, are unacceptable and cannot support an agency's decision to withhold requested documents. *See id.* at 680; *Pacific Architects & Engineers, Inc. v. Renegotiation Board,* 505 F.2d 383, 384–85 (D.C.Cir.1974). But the parties opposing disclosure need not "show actual competitive harm"; evidence revealing "[a]ctual competition and the likelihood of substantial competitive injury" is sufficient to bring commercial information within the realm of confidentiality. *Gulf & Western Industries v. United States,* 615 F.2d at 530.[30]

In this case, the corporate appellees submitted a lengthy expert report and numerous depositions documenting the competitive injury that disclosure would cause. Although the appellants now suggest that the evidence offered by the appellees was contradictory and assert that no competitive harm would result, they did not satisfy the requirements of Federal Rule of Civil Procedure 56 and thus could not avoid summary judgment on this issue. *See* FED.R.CIV.P. 56(e). Those portions of the appellees' voluminous submissions discussing injuries un-

related to the use of disclosed documents by competitors are, in our view, irrelevant. *See* note 30 *supra.* But we have reviewed the appellees' evidence and found that, on the whole, the information submitted was sufficient to support the District Court's conclusions regarding competitive harm.

At several points, however, the District Court's application of an erroneous legal standard and the cursory nature of its discussion of competitive harm have given us pause. In particular, the definition of trade secrets that we have adopted and our doubts concerning the District Court's findings of competitive harm require the court to reconsider its analysis of documents V–3(1), V–3(2), VI–2, I–GG–1, II–B–1, II–B–2(1), and IV–D–6(2). If on remand the District Court is persuaded that the release of these documents would cause substantial competitive harm to the submitting manufacturers, it should authorize the FDA to withhold them under the second prong of Exemption 4.

## III. CONCLUSION

For the reasons set forth above, we affirm in part, reverse in part, and remand the case for further proceedings consistent with this opinion. Documents V–3(1), V–3(2), and VI–2, which the District Court found exempt only under Exemption 3, should be reconsidered; it appears that the District Court found that their release would produce no competitive injury, but the analysis is unclear. The status of docu-

**29.** The appellees did not argue that disclosure of the requested information would inhibit the government's ability to obtain information in the future, a possibility that traditionally has been thought to be wholly mitigated by a statute requiring the submission of information. *See National Parks I,* 498 F.2d at 770. We have recognized more recently that whether future submissions are mandatory is a factor in deciding if governmental access to information will be impaired by disclosure, but it is not necessarily dispositive. *See Washington Post Co. v. United States Dep't of Health & Human Servs.,* 690 F.2d at 268–69; *id.* at 284 (Tamm, J., dissenting).

**30.** We emphasize that

[t]he important point for competitive harm in the FOIA context . . . is that it be limited to harm flowing from the affirmative use of proprietary information *by competitors.* Competitive harm should not be taken to mean simply any injury to competitive position, as might flow from customer or employee disgruntlement or from the embarrassing publicity attendant upon public revelations concerning, for example, illegal or unethical payments to government officials or violations of civil rights, environmental or safety laws.

Connelly, *supra* note 16, at 235–36 (emphasis in original).

ments I–GG–1, II–B–1, II–B–2(1), and IV–D–6(2) should also be reevaluated in light of this opinion; to the extent that the District Court's conclusions regarding them rested on trade secret grounds, they are incorrect, and we cannot determine from the trial court's opinion whether the disclosure of these documents would indeed cause substantial competitive injury. The District Court's assessment of the status of the remaining documents is affirmed.

*So ordered.*