INNER CITY PRESS/COMMUNITY ON THE MOVE, Plaintiff,

v.

BOARD OF GOVERNORS OF THE FEDERAL RESERVE SYSTEM, Defendant.

No. 04 Civ. 8337(DLC).

United States District Court, S.D. New York.

July 19, 2005.

---

124. *Id.* at 41.

212

Richard McKewen, David C. Vladeck, Institute for Public Representation, Washington, D.C., for plaintiff.

Katherine H. Wheatley, Yvonne F. Mizusawa, Board of Governors of the Federal Reserve System, Washington, D.C., for defendant.

### OPINION & ORDER

COTE, District Judge.

This Opinion considers defendant's summary judgment motion and plaintiff's cross-motion regarding plaintiff's request under the Freedom of Information Act ("FOIA"), 5 U.S.C. § 522, for a document submitted to the Board of Governors of the Federal Reserve System (the "Board") by Wachovia Corporation ("Wachovia") and SouthTrust Corporation ("South-Trust") as an exhibit to a merger application. For the reasons described below, both motions are granted in part.

*Background*

The following facts are undisputed unless otherwise noted. Plaintiff Inner City Press/Community on the Move ("ICP") is a nonprofit organization headquartered in the South Bronx. According to the declaration of its executive director, Matthew Lee ("Lee"), ICP engages in advocacy on issues affecting low-income consumers and communities. Among the organization's areas of concern is subprime lending at high interest rates to people with poor or unestablished credit histories. Subprime lenders include payday lenders, pawn shops, and subprime mortgage lenders. In the past, ICP discovered an instance in which a prominent bank was paying its staff referral fees to send borrowers to an affiliated subprime lender for higher-inter-est loans, and another in which a subprime lender affiliated with a prominent bank was charging minority customers higher interest rates than other customers with similar credit histories. In both cases, the publicity spurred by ICP's investigations was instrumental in convincing the lenders to change these practices. ICP often submits public comments regarding banks' subprime lending practices to the Board during the notice-and-comment period that follows the submission of a bank merger application.[1] ICP claims that its comments have caused at least one bank to commit to stop lending to payday and car title lenders pursuant to its merger with another bank.

On July 9, 2004, Wachovia and South-Trust submitted a merger application to the Board (the "Merger Application"). In Wachovia's cover letter of the same date, it requested confidential treatment for certain "Confidential Volumes" that include the disputed exhibit. In a letter of July 19, 2005, Lee made a FOIA request on behalf of ICP seeking the Merger Application and related documents. The following day, the Board released a portion of the Merger Application to ICP but withheld certain documents, including a five-page document entitled "Confidential Exhibit 3: Discussion of Activities Relating to Sub-Prime Lending" ("Exhibit 3"). The released portion of the Merger Application states: "Wachovia has commercial lending relationships with select check cashing companies, pawnshops and payday lenders. In recognition of the higher risk that these businesses present, the Credit Risk policy

---

1. Bank combinations and other ownership transactions meeting certain criteria must be approved by the Board pursuant to the Bank Holding Company ("BHC") Act, 12 U.S.C. § 1842. Under the Community Reinvestment Act ("CRA"), 12 U.S.C. §§ 2901–2908, when the Board examines a financial institution, it shall "assess the institution's record of meet-ing the credit needs of the entire community, including low- and moderate-income neighborhoods, consistent with the safe and sound operation of such institution." *Id.* § 2903(a)(1). ICP premises its comments on banks' subprime lending practices on the requirements of the CRA.

on lending to them is very restrictive.... Please see Confidential Exhibit 3 for information concerning these customers." In its memorandum of law, the Board describes the contents of Exhibit 3 as follows:

> (i) the names of nine of Wachovia's commercial customers that make and/or purchase subprime residential mortgage loans; (ii) the specific amounts and some terms of Wachovia's credit facilities to these customers; (iii) descriptions of other banking services Wachovia provides to, or other relationships with, these customers; (iv) financial data on Wachovia's exposure and loan outstandings to commercial customers who engage in subprime lending; and (v) details regarding the due diligence Wachovia performs in evaluating particular lenders' requests for credit facilities.

The Board cited 5 U.S.C. § 552(b)(4), the fourth FOIA exemption ("FOIA Exemption 4"), which pertains to "commercial or financial information obtained from a person and privileged or confidential," *id.*, as the basis for its denial of ICP's request.

On July 28, 2004, Lee sent another letter to the Board appealing the Board's decision to withhold portions of the Merger Application, including Exhibit 3, and renewing ICP's request for the withheld documents. This request was denied in a letter of August 13, 2004 from Jennifer J. Johnson ("Johnson"), Secretary of the Board. Johnson reiterated that the requested documents were exempt under FOIA Exemption 4. Johnson's letter also stated that no reasonably segregable non-exempt portion of the documents at issue could be provided. ICP filed an administrative appeal on September 17, 2004. The appeal sought only the release of Exhibit 3. On October 6, 2004, ICP's appeal was denied by Susan Schmidt Bies, Gover-

nor of the Federal Reserve Board, again on the basis that Exhibit 3 was exempt from disclosure under FOIA Exemption 4. Later that month, the Board approved the Wachovia–SouthTrust merger.

Plaintiff filed the complaint in this action on October 21, 2004; it requests declaratory and injunctive relief. On December 15, 2004, the parties made a joint request that a schedule be established for defendant's summary judgment motion and plaintiff's cross-motion. The Board submitted a motion supported by declarations of Elaine Boutilier and Andrew S. Baer ("Baer"), both legal counsel for the Board, and of Michael P. Rizer, senior vice president of Wachovia (the "Rizer Declaration"). Plaintiff's cross-motion was supported by a declaration from Matthew Lee (the "Lee Declaration").

*Discussion*

FOIA requires a federal agency to disclose records in its possession unless they fall under one of nine enumerated and exclusive exemptions. 5 U.S.C. § 552(a)(3)-(b); *see also Dep't of the Air Force v. Rose*, 425 U.S. 352, 361, 96 S.Ct. 1592, 48 L.Ed.2d 11 (1976). The statutory exemptions "do not obscure the basic policy that disclosure, not secrecy, is the dominant objective of the Act." *Dep't of the Interior and Bur. of Indian Affairs v. Klamath Water Users Protective Ass'n*, 532 U.S. 1, 8, 121 S.Ct. 1060, 149 L.Ed.2d 87 (2001) (quoting *Rose*, 425 U.S. at 361, 96 S.Ct. 1592). The exemptions are thus to be "given a narrow compass." *Id.* (quoting *U.S. Dep't of Justice v. Tax Analysts*, 492 U.S. 136, 151, 109 S.Ct. 2841, 106 L.Ed.2d 112 (1989)); *see also Nat'l Council of La Raza v. Dep't of Justice*, 411 F.3d 350 (2d Cir.2005). A district court has jurisdiction "to enjoin the agency from withholding agency records and to order the production of any agency records improperly withheld from the complainant." 5 U.S.C.

§ 552(a)(4)(B). The court "shall determine the matter de novo ... and the burden is on the agency to sustain its action." *Id.; see also Fed. Open Market Comm. v. Merrill,* 443 U.S. 340, 352, 99 S.Ct. 2800, 61 L.Ed.2d 587 (1979).

A court cannot grant summary judgment unless all of the submissions taken together "show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Rule 56(c), Fed.R.Civ.P. "In order to prevail on a motion for summary judgment in a FOIA case, the defending agency has the burden of showing that its search was adequate and that any withheld documents fall within an exemption to the FOIA." *Carney v. Dep't of Justice,* 19 F.3d 807, 812 (2d Cir.1994). Although the court is entitled to *in camera* review of disputed documents, *see* 5 U.S.C. § 552(a)(4)(B), on a summary judgment motion, "[a]ffidavits or declarations ... giving reasonably detailed explanations why any withheld documents fall within an exemption are sufficient to sustain the agency's burden." *Carney,* 19 F.3d at 812. FOIA also requires that "[a]ny reasonably segregable portion of a record shall be provided to any person requesting such record after deletion of the portions which are exempt under this subsection." 5 U.S.C. § 552(b).

FOIA Exemption 4 encompasses "trade secrets and commercial or financial information obtained from a person and privileged or confidential." 5 U.S.C. § 552(b)(4). The Second Circuit has articulated a tripartite test for satisfying the requirements of the exemption: "The information for which exemption is sought must be a 'trade secret' or 'commercial or financial' in character; (2) it must be 'obtained from a person,' and (3) it must be 'privileged or confidential.'" *Nadler v. Fed. Deposit Ins. Corp.,* 92 F.3d 93, 95 (2d

Cir.1996) (quoting 5 U.S.C. § 552(b)(4)). Plaintiff concedes that Exhibit 3 is commercial or financial in character and was obtained from Wachovia, a corporation that qualifies as a person under the statute, *see* 5 U.S.C. § 551(2); the sole dispute is thus whether the information contained in the document is "privileged or confidential" under the statute.

▮▮▮▮ To qualify as "confidential" for purposes of 5 U.S.C. § 552(b) (4), the information "must have the effect either (1) of impairing the government's ability to obtain information—necessary information—in the future, or (2) of causing substantial harm to the competitive position of the person from whom the information was obtained." *Nadler,* 92 F.3d at 96 (quoting *Continental Stock Transfer & Trust Co. v. SEC,* 566 F.2d 373, 375 (2d Cir.1977)). This test is known as the *"National Parks"* test because it was first articulated in *National Parks & Conservation Association v. Morton,* 498 F.2d 765, 770 (D.C.Cir.1974). After examining the hearing record for the predecessor of the bill that became FOIA, the *National Parks* court explained the rationale for Exemption 4 as follows: "encouraging cooperation by those who are not obliged to provide information to the government and ... protecting the rights of those who must." *Id.* at 769. In enacting Exemption 4, "Congress intended to exclude the release of material which would customarily not be released to the public by the person from whom it was obtained so long as nondisclosure is justified by the legislative purpose which underlies the exemption." *Nadler,* 92 F.3d at 96 (citation omitted).

▮▮▮ The Board argues that Exhibit 3 is exempt under both prongs of the *National Parks* test. The test is disjunctive, so to carry its burden, the Board need only establish that the criteria for one of the two prongs are met.

1. Impairment of the Agency's Ability to Obtain Necessary Information in the Future

■ Under the first prong of the *National Parks* test, a court must determine whether the disclosure of the information at issue will impair the agency's ability to obtain similar necessary information in the future. *National Parks*, 498 F.2d at 770. The policy behind this prong is clear: "Unless persons having necessary information can be assured that it will remain confidential, they may decline to cooperate with officials and the ability of the Government to make intelligent, well informed decisions will be impaired." *Id.* at 767. When submission of information is mandatory, "there is a presumption that the Government's interest is not threatened by disclosure." *Critical Mass Energy Project v. Nuclear Regulatory Comm'n*, 975 F.2d 871, 878 (D.C.Cir.1992) (en banc);[2] *see also National Parks*, 498 F.2d at 770 ("Since [persons] are required to provide this ... information to the government, there is presumably no danger that public disclosure will impair the ability of the Government to obtain this information in the future."). As the Court of Appeals for the D.C. Circuit emphasized in *Critical Mass*, however, even when the government has the power to compel the production of information, the quality of the information furnished in compliance with the government might suffer if the furnisher of the information believes it may be publicly disclosed. "[W]hen dealing with a FOIA request for information the provider is required to supply, the governmental impact inquiry will focus on the possible effect of disclosure on its *quality.*" *Critical Mass*, 975 F.2d at 878 (emphasis supplied); *see also Africa Fund v. Mosbacher*, No. 92 Civ. 289(JFK), 1993 WL 183736, at *7 (S.D.N.Y. May 26, 1993) ("[C]onfidentiality ... fosters the provision of full and accurate information."). When information is furnished to the government voluntarily, the government has an interest in "encouraging cooperation ... by persons having information useful to officials." *National Parks*, 498 F.2d at 768. In sum, "when information is obtained under duress, the Government's interest is in ensuring its continued reliability; when that information is volunteered, the Government's interest is in ensuring its continued availability." *Critical Mass*, 975 F.2d at 878.

The Board contends that disclosure of Exhibit 3 would impair its ability to obtain similar information in the future, thus justifying the document's exclusion under the first prong of the *National Parks* test. The Board acknowledges that it "has the statutory authority to require applicants to

---

**2.** Notably, in *Critical Mass,* the Court of Appeals for the D.C. Circuit ruled that the application of the *National Parks* test was "confine[d] ... to information that persons are *required* to provide to the government." *Critical Mass,* 975 F.2d at 872 (emphasis supplied). It applied a different standard to information voluntarily provided to the government; such information could be withheld under FOIA if it "would customarily not be released to the public by the person from whom it was obtained." *Id.* at 878 (citation omitted). The Second Circuit has explicitly held off on determining whether it would accept the *Critical Mass* "amendment" of the *National Parks* test. *Nadler,* 92 F.3d at 96 n.

1. Both parties recognize that the *National Parks* test applies in this case, so the issue of the applicability of the *Critical Mass* analysis need not be reached here. It should be noted, however, that when voluntarily submitted information is at issue, the *Critical Mass* amendment is merely a commonsensical extrapolation of the first prong of the *National Parks* test: if a person, for any reason of substance, would not ordinarily wish a particular type of information to be disclosed to the public and truly has a choice whether or not to submit the information to the government, that person will likely choose not to submit such information if the government may disclose it to the public.

submit some information regarding their relationships with subprime lenders as part of the application process, and that it may disapprove a proposal if the applicant fails to provide sufficient evidence to show that statutory standards are met." [3] The merger application instructions themselves, appended as Exhibit 1 to the Baer Declaration, do not specifically require an applicant to detail its relationships with subprime lenders, however. Baer reports that Wachovia provided Exhibit 3 in response to a telephone conversation with a member of the Board's staff, in which the staff member told a Wachovia representative, in essence, that the Board "had taken into account applicants' relationships with subprime lenders in assessing financial and managerial factors in past applications in which public commenters had raised questions regarding these relationships," leading Wachovia to believe that the submission of such information might expedite the processing of the Merger Application. The Board in fact considered Exhibit 3 in determining whether Wachovia's relationships with subprime lenders presented "significant legal, credit, or reputational risk" to Wachovia. *Cf.* 12 U.S.C. § 1842(c)(2). According to the Rizer Declaration, however, if Wachovia had known that the information could be disclosed to the public, it might have submitted a document that omitted some of the information provided, including the identities of its clients and specific loan terms and practices.[4]

Given the time-pressured merger application context, the telephone call suggesting that the Board would require information about Wachovia's dealings with such entities suffices to qualify at least a portion of the information provided as mandatory.[5]

---

**3.** The parties dispute the extent to which the CRA independently requires the submission of information regarding a bank's business with subprime lenders. That the CRA compels a bank to submit information as specific as loan terms and names of clients engaged in subprime lending pursuant to a bank merger is implausible, however. The most concrete language in the CRA is quoted *supra* note 1; the provision requires a general assessment of a bank's record of "meeting the credit needs of the entire community." 12 U.S.C. § 2903; *cf. also Lee v. Bd. of Governors of the Fed. Reserve Sys.*, 118 F.3d 905, 913 (2d Cir.1997) ("[A]ny attempt to glean substance from the CRA is met with the reality that the statute sets no standards for the evaluation of a bank's contribution to the needs of its community.").

The Board notes that it considered information about Wachovia's involvement with subprime lenders "in assessing the financial and managerial resources and future prospects of Wachovia and SouthTrust," an analysis the Board is required to undertake under the BHC Act, 12 U.S.C. § 1842(c)(2). That the Board had the power to compel at least some of the information provided in Exhibit 3 is undisputed; the relevant question, however, is whether it exercised its power to compel all categories of information in Exhibit 3. *See infra* note 5.

**4.** The Rizer Declaration states specifically:

[I]f [Wachovia] had known that the information in … Exhibit 3 would be made public, Wachovia likely would have provided the Board with a more generic description of its relationships with sub-prime lenders and its policies and practices with respect to financing sub-prime lenders; but would not have provided the Board with the actual names of its sub-prime lending clients, or the specific amount or terms of the credit facilities provided to those clients.

**5.** There is some ambiguity in the case law as to whether the relevant query is whether the agency had the authority to compel the submission of particular information or whether it actually did compel the information. *Compare Ctr. for Auto Safety v. Nat'l Highway Traffic Safety Admin.*, 244 F.3d 144, 149 (D.C.Cir.2001) (framing the voluntary-mandatory distinction as one determined by an agency's "actual legal authority," where an agency had demanded information it had no authority to collect), *with Parker v. Bureau of Land Mgmt.*, 141 F.Supp.2d 71, 78 n. 6

Because of the stated concern regarding "financial and managerial factors," such a request would reasonably be construed to require, at the very least, two categories of information in the document withheld by the Board: aggregate "financial data on Wachovia's exposure and loan outstandings to commercial customers who engage in subprime lending"[6] and "details regarding the due diligence Wachovia performs in evaluating particular lenders' requests for credit facilities," corresponding to numerals (iv) and (v) in the Board's description of the information in Exhibit 3.

The telephonic request is too amorphous, however, to be construed as a demand that Wachovia provide the identities of specific clients, specific loan terms and amounts, and descriptions of other services provided to those customers, corresponding to numerals (i), (ii), and (iii). These latter categories of information were provided voluntarily by Wachovia. According to the Rizer Declaration, in the ordinary course, a bank would be unlikely to disclose client lists, loan terms, and similar data to the public for fear of competitive harm. ICP does not dispute this,[7] al-

though it argues that certain information regarding the underwriting of securities must be disclosed to the SEC, a point addressed *infra*. Because a bank would not voluntarily disclose information regarding client identities, loan amounts and terms, and other services provided to clients, to mandate its disclosure in this instance would impair the Board's ability to collect such information using similarly worded requests in the future. This information was therefore properly withheld.

Because the information contained in numerals (iv) and (v) was compelled, there is a presumption that the Board's ability to obtain similar information will not be impaired in the future. It is clear that the defendant has not rebutted this presumption. The Board is unlikely to be hindered in its efforts to obtain such data as the total exposure and loan outstandings contained in category (iv), given the discrete, objective nature of the numbers. The likelihood that an agency will be impaired in collecting mandatory information by an inability to assure confidentiality diminishes significantly the more objective, specific, and quantifiable the information required.

(D.D.C.2001) (stating in *dicta* that "[i]n addition to possessing the authority to compel submission, the agency must also exercise that authority in order for a submission to be deemed mandatory"). Equating an agency's statutory authority with the actual exercise of that authority in situations like this would effectively force the agency to be more assertive in the exercise of its authority in the future to obtain similar information, because applicants, knowing that their information was subject to public disclosure, would likely submit the bare minimum required. Such an approach would discourage full and voluntary cooperation with the government and would make its operations more cumbersome. Therefore, it is necessary to consider both the Board's legal authority to make a request and its actual assertion of its authority when assessing whether the information was obtained under duress. The theoretical boundary of an agency's authority alone is an insufficient ba-

sis to qualify material provided to the agency as mandatory.

6. That these are aggregate figures is confirmed in the Rizer Declaration.

7. ICP does point out that two banks have submitted information about clients engaged in subprime lending pursuant to merger applications without requesting confidential treatment. In his Supplemental Declaration, however, Baer notes, citing several examples, that "the general practice" among applicants has been to request that the Board keep such information confidential. He further attests, and provides documentary support to establish, that the information voluntarily disclosed by the two banks cited as examples by ICP was much more limited than that requested here, and that both banks did in fact request confidential treatment for their unredacted or more detailed submissions.

*Compare, e.g., Niagara Mohawk Power Corp. v. U.S. Dep't of Energy,* 169 F.3d 16, 18 (D.C.Cir.1999) (rejecting an agency's uncontroverted but "conclusory" assertion of impairment because "the data sought appears to take the form of hard, cold numbers ..., the fudging of which may strain all but the deliberately mendacious"), *with Wash. Post Co. v. U.S. Dep't of Health and Human Servs.,* 690 F.2d 252, 268 (D.C.Cir.1982) (noting that the disclosure form in question left "room for interpretation" in the nature of the information required, and remanding for a determination of the extent of the impairment of the government's access to the information on this basis).

The analysis regarding category (v) is not as straightforward. There is certainly more room for interpretation available to persons required to submit information regarding the due diligence a bank performs in approving the extension of credit to subprime lenders, although a bank would have a strong incentive to set forth specific practices and criteria to prove that it was not exposing itself to undue risk in extending credit to subprime lenders. Also weighing toward a finding that the Board's ability to elicit similar information would not be impaired by the possibility of public disclosure is the fact that the Board has the power to reject a merger application if the information contained within it is insufficient, *see* 15 U.S.C. § 1842, and applicants are highly motivated to make detailed and thorough submissions to the Board to complete their merger plans as swiftly as possible. Because the burden of supporting non-disclosure is on the Board, and the Board has made no argument or showing directed specifically at item (v), this analysis is sufficient to find that the Board's future ability to collect information similar to that described under numerals (iv) and (v) will not be impaired.

Summary judgment is accordingly granted for defendants as to the client names, loan terms and amounts, and additional banking services noted in Exhibit 3, corresponding to numerals (i), (ii), and (iii) in the Board's description of the withheld materials excerpted above. This grant of summary judgment is subject, however, to the exception of certain information that is already available to the public in SEC filings, as discussed *infra* Part 3. The remaining categories of information—Wachovia's aggregate exposure and loan outstandings to clients that engage in subprime lending and its due diligence practices relating to such clients— must be analyzed under the second prong of the *National Parks* test.

2. Substantial Competitive Harm to the Provider of the Information

■ Under the second prong of the *National Parks* test, information may be withheld by an agency if its disclosure is likely "to cause substantial harm to the competitive position of the person from whom the information was obtained." *National Parks,* 498 F.2d at 770. To make this determination, "the court need not conduct a sophisticated economic analysis of the likely effects of disclosure." *Pub. Citizen Health Research Group v. Food & Drug Admin.,* 704 F.2d 1280, 1291 (D.C.Cir.1983). It need only determine that the person who submitted the information faces both (1) actual competition and (2) a likelihood of "substantial" competitive injury if the information were released. *Id.* (citation omitted). ICP does not appear to dispute that Wachovia is in actual competition with other lenders; the controversy centers around the requirement that there be a likelihood of substantial competitive injury to Wachovia.

Before the Board's arguments can be addressed, it is necessary to determine

whether the erosion of a small subset of a merger applicant's business can constitute "substantial competitive injury" under the test. ICP argues that, because neither bank involved in the merger engages in significant business with subprime lenders, the disclosure of Exhibit 3 cannot possibly cause it substantial competitive harm. It argues, in essence, that because Exhibit 3 contains information relating to only nine subprime lenders, while Wachovia's total consolidated assets were worth approximately $418 billion prior to the merger,[8] that it can be inferred that any competitive damage to Wachovia from the disclosure of information in Exhibit 3 would be minimal. At least one circuit has specified that competitive injury is to be measured in terms of the "relevant market." *Lion Raisins Inc. v. U.S. Dep't of Agric.*, 354 F.3d 1072, 1079 (9th Cir.2004). Moreover, courts routinely conduct their analyses without regard to the total size or composition of the business whose competitive interests are at stake. *See, e.g., Public Citizen*, 704 F.2d at 1290–92 (analyzing competitive injury to manufacturers of a particular product without regard to the overall composition of the manufacturers' businesses); *Judicial Watch, Inc. v. Export–Import Bank*, 108 F. Supp 2d 19, 29 (D.D.C.2000) (assessing competitive injury on the basis of single transactions or projects). Accordingly, the potential for competitive injury to Wachovia is assessed in respect to the relevant market, which the Board characterizes as commercial credit facilities for financial institutions.[9]

The Board raises no arguments that weigh squarely against the public release of information regarding Wachovia's aggregate loan outstandings and exposure to clients engaged in subprime lending or its due diligence practices in evaluating requests from such clients for credit, corresponding to numerals (iv) and (v) in the Board's description of Exhibit 3. The Board makes one argument that is theoretically relevant to Wachovia's due diligence practices; it contends that the release of Exhibit 3 would put Wachovia at a disadvantage in bargaining situations because competitors would have knowledge of Wachovia's "business practices in pricing and underwriting commercial credit facilities, which the competitors could use to undercut Wachovia's efforts to gain new clients." The argument centers, however, on "proprietary information regarding ... relationships with ... clients," none of which would be revealed if general information on Wachovia's due diligence practices were revealed. The Board makes no showing that a generalized account of Wachovia's due diligence practices would cause Wachovia competitive harm. It also makes no showing that the release of aggregate financial data would harm Wachovia.

Summary judgment is accordingly granted to plaintiff regarding the information characterized under numerals (iv) and (v) of the Board's description of the withheld information: "financial data on Wachovia's exposure and loan outstandings to commercial customers who engage in subprime lending" and "details regarding the due diligence Wachovia performs in evaluating particular lenders' requests for credit facilities."

3. Public Availability of the Information at Issue

ICP contends that certain underwriting-related information in Exhibit 3 is avail-

---

**8.** For its part, SouthTrust had ten loans outstanding to pawn shops and similar entities, totaling $755,056, at the time of the merger, and consolidated assets of $53 billion.

**9.** Given that the Board's arguments are insufficient to warrant summary judgment in its favor, it is unnecessary to determine whether this characterization is precisely appropriate.

able in Securities and Exchange Commission ("SEC") filings.[10]  Such information could conceivably fall into one of the three Exhibit 3 categories that pertain to information that the Opinion has determined would otherwise be exempt under the first prong of the *National Parks* test.  The Rizer Declaration attests that Exhibit 3 indicates whether Wachovia "will act as a market maker or underwriter with respect to securities issued by some of its clients," although it does not state that Wachovia had participated in offerings that would be reflected in SEC filings as of the date Exhibit 3 was submitted.

■ If the requested information is already available to the public, it cannot be withheld under Exemption 4. *See Cont'l Stock Transfer & Trust Co. v. SEC*, 566 F.2d 373, 375 (2d Cir.1977) (per curiam). The party asserting that information is publicly available bears the burden of producing evidence to that effect, although the burden of persuasion remains on the agency.  *See Occidental Petroleum Corp. v. SEC*, 873 F.2d 325, 342 (D.C.Cir.1989).

To meet its burden, ICP effectively asks the Court to take judicial notice of SEC filing requirements.  The Board concedes that "some references to Wachovia's role as an underwriter might technically be public" but argues that if information is not readily accessible, its "practical obscurity" would be "sufficient to render it nonpublic for FOIA purposes," relying on *U.S. Dep't of Justice v. Reporter's Comm. for Freedom of the Press*, 489 U.S. 749, 762,

764, 109 S.Ct. 1468, 103 L.Ed.2d 774 (1989) (considering the personal privacy exemption under 5 U.S.C. § 552(b)(7)(c) regarding information compiled for law enforcement purposes).  The issue in *Reporter's Committee* was "whether the compilation of otherwise hard-to-obtain information alters the privacy interest implicated by disclosure of that information." *Reporter's Committee*, 489 U.S. at 764, 109 S.Ct. 1468.  It is difficult, however, to liken SEC filings, which are subject to electronic search, to "courthouse files, county archives, and local police stations throughout the country," *id.*, as suggested by the Board's analogy.  Moreover, the Board would not have to search "all possible SEC filings by subprime lenders to find references to Wachovia," as its reply memorandum suggests; only nine clients are named in Exhibit 3, and, based on the Board's description of Exhibit 3, the fact that Wachovia had provided underwriting services for a given client would be indicated.  Accordingly, if the fact that Wachovia has provided credit facilities to any of the clients listed in Exhibit 3 has already been disclosed to the public in SEC filings,[11] *and* Exhibit 3 itself indicates that underwriting services have been provided to one or more of the listed clients, such information in Exhibit 3 must likewise be disclosed to the extent it is already public.

### 4.  Reasonable Segregability

As noted above, the Board claimed in response to ICP's request that no reason-

---

**10.**  In its original Memorandum of Law, ICP also argued that the Exhibit 3 information was publicly available in state filings pursuant to 9 U.C.C. § 310.  ICP appends eleven state U.C.C. filings to the Lee Declaration.  The Rizer Declaration submitted by the Board, however, counters that none of the customers listed in the U.C.C. filings is named in Exhibit 3, most likely because the U.C.C. filings are for small business loans transacted through

Wachovia branch offices.  In its reply memorandum, ICP fails to press its argument premised on U.C.C. requirements.

**11.**  *Cf.* 17 C.F.R. § 229.508(a) (requiring that "each ... underwriter having a material relationship with the registrant and ... the nature of the relationship" be disclosed in a registration statement).

ably segregable nonexempt portion of the documents at issue could be provided. Given that Exhibit 3 is a mere five pages long, it is assumed that the Board will have little trouble redacting all but the portions this Opinion has ruled nonexempt and that the segregability of the nonexempt information is therefore not an issue.

*Conclusion*

Summary judgment is granted for defendant as to client names, specific loan amounts and terms, and descriptions of other banking services provided to clients engaged in subprime lending, corresponding to numerals (i), (ii), and (iii) of the Board's description of the withheld contents of Exhibit 3, except to the extent that information is disclosed in SEC filings. Summary judgment is granted for plaintiff as to data regarding aggregate exposure and loan outstandings and due diligence practices, corresponding to numerals (iv) and (v) of the Board's description. The Clerk of Court shall close the case.

SO ORDERED.